**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| MAGALITA CAZEAU PIERRE-LOUIS<br>Petitioner,<br>v.<br><br>PATRICIA HYDE, et al.,<br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 26-cv-13914-WGY |

**<u>SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE THIS COURT'S ORDER AND FOR CONTINUED RELEASE</u>**

Petitioner Magalita Bernadette Cazeau Pierre Louis ("Petitioner" or "Magalita Pierre-Louis" or "Magalita"), through her undersigned counsel, respectfully submits this Supplemental Memorandum to address the questions raised by the Court at the October 1, 2026 hearing.

At that hearing, this Court asked for further briefing on the scope of federal district court review in habeas jurisdiction, in light of the jurisdiction stripping provisions of the Immigration and Nationality Act ("INA"), which prohibit review in this court of issues "arising from" the removal proceeding itself (Sections 1259(b)(9)) and in any court of the "discretionary decisions" of the Immigration Judge ("IJ") as to custody (Section 1226(e). The Court also asked that the parties address what the standard of review is for review of an IJ decision. Petitioner submits that

(1) clear and controlling authority make clear that Sections 1259(b)(9) and 1226(e), the jurisdiction stripping provisions of the Immigration and Nationality Act (the "INA"), do not deprive this court of jurisdiction to address the *issues of law* in this habeas proceeding challenging Petitioner Magalita's *detention,* and

(2) the standard for review is that the Court reviews for errors of law *de novo.* This includes whether a set of facts are sufficient to meet the legal standard, such as the Petitioner raises in her Motion to Enforce. *See Wilkinson v. Garland*, 601 U.S. 209, 217 (2024) (holding that the "application of a . . . legal standard . . . to an established set of facts" is a reviewable questions of law, not an unreviewable "discretionary" decision).

The First Circuit decided long ago in *Aguilar v. United States Immigration & Customs Enforcement Div.,* 510 F.3d 1, 10-11 (1st Cir. 2007) that claims like these challenging the legality of immigration detention are "independent" of removal proceedings, so Section 1252(b)(9) does not apply to them at all. *Id.* The Supreme Court's decision in *Jennings v. Rodriguez*, 583 U.S. 281 (2018) and the First Circuit's recent narrow reading of the statutory phrase "arising from" in *Kong v. United States*, 62 F.4th 608 (1st Cir. 2023) confirm that.

Clear precedent also establishes that the immigration courts do not have unreviewable "discretion" under Section 1226(e) to apply the wrong bond procedures, *see, e.g., Hernandez-Lara*, 10 F.4th 19, 40 (1st Cir. 2021), or base a finding that a legal standard has been met on facts that are insufficient as a matter of law to meet that standard. *See, e.g., Wilkinson*, 601 U.S. at 217.

Moreover, as demonstrated in the chart attached as Exhibit A, it appears that courts in this circuit (as well as elsewhere) have overwhelmingly recognized that the district court in habeas jurisdiction has the power and duty to review IJ's bond determinations for such legal compliance. In fact, in the vast majority of the cases, courts have concluded, either explicitly or implicitly, that the court has jurisdiction. Moreover, in many, more than 60 times in about the last year, district courts in this circuit have determined that the immigration judge violated the legal standards required by the constitution. *See* Exh. A (cases with green coding). In a smaller number, the courts have found that the court has jurisdiction to review but found that the record did not demonstrate such a violation of law. *Id.*[1]

[1] In accordance with the Court's instructions, counsel has provided summaries of all of the district court decisions on Motions to Enforce habeas orders in the First Circuit that counsel identified. Since the identification was done by database searches with key words, this chart may not include all such cases. Moreover, the summaries provided are an effort to provide the key points relevant to the Court's questions in a succinct and manageable format but may not capture all of the conclusions or nuances of each case. Counsel will also provide a version of the spreadsheet in native format in case that is useful for the Court.

Where, as here, liberty is at stake, any error of law in the chain of decision-making leading to a denial of release is not only subject to *de novo* review by this Court in habeas jurisdiction but also a basis for habeas relief. Here, Petitioner submits that evidence was insufficient to meet the government's burden of proving dangerousness by clear and convincing evidence based upon an unproven charge that Petitioner slapped her 18-year-old son. It also failed to demonstrate by clear and convincing evidence, as required to establish dangerousness from release, that there were no conditions of release that could sufficiently mitigate any purported danger.

## ARGUMENT

### I. THE DISTRICT COURTS RETAIN JURISDICTION IN HABEAS TO REVIEW NON-DISCRETIONARY QUESTIONS OF LAW AS TO DETENTION.

#### A. Challenges to detention during proceedings do not "arise from" removal proceedings and are not appealable to the circuit courts.

Petitioner's claims are not barred by Section 1252(b)(9) first because she is "not asking for review of an order of removal," and thus is "not even challenging any part of the process by which [her] removability will be determined." *Jennings*, 583 U.S. at 293. Section 1252(b)(9) only restricts judicial review "of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, *arising from* any action taken or proceeding brought to remove an alien from the United States." *Id.*

The Supreme Court in *Jennings*, made clear that "arising from" does not reach claims that challenge detention, rather than proceedings to determine removal. *Jennings* considered habeas claims brought by individuals detained under 8 U.S.C. §§ 1225(b), 1226(a), and 1226(c) who argued that they were being unlawfully denied periodic bond hearings. 583 U.S. at 287–292. Six justices held that Section 1252(b)(9) does not strip the district court of jurisdiction. *Id.* at 293–95 (plurality), 355 (dissent). The plurality in *Jennings* explained, "arising from" in this context does

not prescribe a but-for causation test. *Id.* at 293. Such an "extreme" interpretation would lead to "staggering results" that "no sensible person could have intended." *Id.* For instance, it explained, that would "make claims of prolonged detention effectively unreviewable," because "[b]y the time a final order of removal was eventually entered" and a Petition for Review could be filed, "the allegedly excessive detention would have already taken place." *Id.* at 293. In that case, where the claimants were "not asking for review of an order of removal," "not challenging the decision to detain them in the first place," and "not even challenging any part of the process by which their removability will be determined," six justices agreed that Section 1252(b)(9) did not apply at all. *Id.* at 294 (plurality); *see also id.* at 355 (dissent).[2]

In *Aguilar*, the First Circuit expressly held that habeas claims challenging immigration detention do not fall within Section 1252(b)(9)'s sweep. 510 F.3d at 10-11, 19 (holding that "district courts retain jurisdiction over challenges to the legality of detention in the immigration context"). This confirmed the First Circuit's earlier decision in *Hernandez v. Gonzalez*, 424 F.3d 42 (1st Cir. 2005) (memorandum and order), that nothing in 8 U.S.C. § 1252 strips federal district courts of jurisdiction to hear habeas petitions challenging immigration detention. *Aguilar*, 510 F.3d at 11 (explaining that *Hernandez v. Gonzalez* holds broadly "that detention claims are independent of removal proceedings and, thus, not barred by section 1252(b)(9)"). The First Circuit in *Aguilar* explained that the words "arising from" in Section 1252(b)(9), do not reach claims "that are independent of, or wholly collateral to, the removal process," including "claims that cannot effectively be handled through the available administrative process" for adjudicating removal. 510

[2] The three-justice dissent would have rested the decision on the broader grounds that Section 1252(b)(9), "by its terms[,] applies only '[w]ith respect to review of an order of removal under 1252(a)(1),'" referring to language in Section 1252(b)'s caption and prefatory language that introduces Section 1252(b)(9). *Id.* at 355.

F.3d at 10-11. The court in *Aguilar* also pointed to the legislative history of the REAL ID Act of 2005, noting "Congress stated unequivocally that the channeling provisions of [S]ection 1252(b)(9) should not be read to preclude 'habeas review over challenges to detention.'" 510 F.3d at 11 (quoting H.R. Rep. No. 109-72, at 175 (2005) (Conf. Rep.).

Finally, in *Kong v. United States*, 62 F.4th 608 (1st Cir. 2023), the First Circuit held that claims based on ICE's failure to follow lawful process in arresting the plaintiff to facilitate his removal did not "aris[e] from" their decision to execute his removal order, as the phrase is used in 8 U.S.C. 1252(g). *Id.* at 612–18. Relying on *Aguilar*'s interpretation of the same phrase in Section 1252(b)(9), *Kong* interpreted "arising from" *not* to reach issues "collateral to" ICE's discretionary decision to execute a removal order, like the unlawfulness of arrest. *Id.* at 613–14, 617.

Petitioner's claims to enforce a legally proper bond hearing are thus not subject to Section 1252(b)(9) jurisdiction stripping because they do not "aris[e] from" an "action taken or proceeding brought to remove" her. Instead, her detention-focused claims are based on questions "independent" of and "collateral to" those removal proceedings. *Aguilar*, 510 F.3d at 11; *see also Kong*, 62 F.4th at 617. Petitioner's claims that she can be detained only based upon a constitutional custody redetermination are thus equally subject to this court's jurisdiction as the original petition pursuant to which the Court ordered such a hearing.

B. <u>There is no viable alternative appeal path for challenges to IJ detention decisions.</u>

Further, Petitioner's claims are not properly restricted by Section 1252(b)(9) because her custody redetermination cannot "effectively be handled" through administrative removal proceedings and thus is not appealable to the circuit court. *Aguilar*, 510 F.3d at 11 (noting that "certain claims, by reason of the nature of the right asserted, cannot be raised efficaciously within the administrative proceedings … Requiring the exhaustion of those claims would foreclose them

from any meaningful judicial review. (citations omitted)"). By regulation, an IJ's consideration of a custody redetermination request "shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding." 8 C.F.R. § 1003.19(d).[3] Clearly, claims cannot be resolved through a process that they must be separate from and of which they form no part.

Outside of habeas jurisdiction, there is no other viable path for review of a bond determination as to an immigration detainee's liberty by an Article III court. Custody redeterminations are distinct from administrative removal proceedings and cannot be meaningfully reviewed through the Petition for Review ("PFR") process for reviewing final orders of removal to the circuit courts under the INA. This is true for at least two reasons. *First,* with limited exceptions not relevant here, review by a circuit court of a PFR is limited to "the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A); *see also Adeyanju v. Garland*, 27 F.4th 25, 52 (1st Cir. 2022). Because custody redeterminations must be kept "separate and apart from" removal proceedings, 8 C.F.R. § 1003.19(d), they are not a part of that record and are not even before a circuit court hearing a PFR. *Second*, Petitioner would not even be able to file a PFR until after her administrative removal proceedings ended. *See* 8 U.S.C. § 1101(a)(47)(B); 8 U.S.C. § 1252(a)(1), (b)(9). By then, as in *Jennings*, "the allegedly excessive detention would have already taken place." 583 U.S. at 293. This is an "absurd" result that "no sensible person could have intended." *Id.* at 293–94; *see also Mathew v. Mukasey*, 297 Fed. Appx. 15, 16 (1st Cir. 2008)

[3] These two administrative tracks are entirely distinct from beginning to end. In removal proceedings, "[j]urisdiction vests, and proceedings before an [IJ] commence, when a charging document is filed with the Immigration Court by [DHS]." 8 C.F.R. § 1003.14(a). By contrast, "no charging document is required to be filed with the Immigration Court" for an IJ "to commence bond proceedings," *id.*, and jurisdiction instead vests when a noncitizen files a request for a custody redetermination. *See* 8 C.F.R. §§ 236.1(d), 1236.1(d), 1003.19(b)–(c). Further, counsel can appear in a noncitizen's removal proceedings without appearing in their custody proceedings, and vice versa. 8 C.F.R. § 1003.17(a).

(holding that "a petition for review, filed under 8 U.S.C. § 1252, is not the proper vehicle" for a "challenge to the conditions of . . . detention pending the completion of . . . removal proceedings").

C. <u>Section 1226(e) does not strip the district court of jurisdiction, because it applies only to "discretionary" decisions, not questions of law like those raised here.</u>

1. *Section 1226(e) does not restrict habeas jurisdiction to review compliance with the law in detention proceedings.*

Section 1226(e) of the INA also does not bar this Court from granting Petitioner the relief she seeks because Section 1226(e) restricts only review of discretionary decisions and no judge has discretion to violate the law or the Constitution, as the IJ did here. Section 1226(e) provides that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review" and that "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e). The Supreme Court and the First Circuit have confirmed that Section 1226(e) "applies only to 'discretionary' decisions about the 'application' of § 1226 to particular cases." *Hernandez-Lara*, 10 F.4th at 33–34 (holding that Section 1226(e) did not bar jurisdiction over claim that the constitution requires that the burden of proof be placed on DHS in bond hearings for noncitizens detained under Section 1226(a)); *Nielsen v. Preap*, 586 U.S. 392, 401 (2019) (plurality) ("As we have held, [Section 1226(e)] applies only to "discretionary" decisions" and holding that Section 1226(e) did not bar jurisdiction over claim that Section 1226(c) only authorized detention without bond for noncitizens arrested immediately after their release from criminal detention); *Jennings*, 583 U.S. at 295–96 (plurality) (holding Section 1226(e) did not bar jurisdiction over claim that Sections 1225(b)(1), 1226(a), and 1226(c) should be interpreted to require periodic bond hearings); *id.* at 354–55 (dissent) (agreeing that court had jurisdiction to hear claim); *Demore v. Kim*, 538 U.S. 510, 516–17 (2003) (holding that Section 1226(e) did not

bar jurisdiction over claim asserting that mandatory detention without bond under Section 1226(c) based only on prior criminal convictions is unconstitutional); *see also Patel v. Garland*, 596 U.S. 328, 341 (2022) (explaining that Section 1226(e) is interpreted as "limit[ed] to 'discretionary judgments'"); *Saint Fort*, 329 F.3d 191, 200 (1st Cir. 2003) (explaining that "the jurisdiction-limiting provision in § 1226(e) . . . appl[ies] only to review of the Attorney General's discretionary judgment").

Thus, as the First Circuit explained in *Hernandez-Lara v. Lyons*, 10 F.4th at 34, "our decision cabins the discretion granted by section 1226(a) through the constitutional restraints applicable to all government action." *See also De Souza v. Moniz*, 26-cv-13639, Dkt. #23 (text order) (D. Mass. Sept. 16, 2026) ("While the government maintains discretion in each case to grant or deny bond, such discretion is limited by the constitutional restraints applicable to all government action."). Accordingly, an IJ has no authority insulated from judicial review to fail to comply with custody determination procedures required by Constitution of the United States or to find dangerousness on a record that is insufficient as a matter of law to support such a finding. Were the law otherwise, the entire custody determination process could devolve into a constitutionally inadequate sham without any recourse in habeas. The law neither requires nor permits that unconstitutional outcome.

2. *Review as to whether an undisputed factual record meets a legal standard is a non-discretionary question of law.*

The Supreme Court and the First Circuit have also long held that deciding whether a set of facts are sufficient to meet a legal standard is a question of law, not a discretionary judgment of the type that falls within Section 1226(e)'s sweep. *See, e.g.*, *Wilkinson*, 601 U.S. at 212, 217 (holding that the "application of a statutory legal standard . . . to an established set of facts" is a reviewable questions of law, not an unreviewable "discretionary" decision); *Hernandez-Lara*, 10

F.4th at 33–34 (holding that the extent of a "constitutional restraint[]" on detention is not a "discretionary" decision within the sweep of Section 1226(e)); *Jennings*, 583 U.S. at 295–96 (holding that "the extent of the Government's detention authority under the 'statutory framework' as a whole" or "the constitutionality of the entire statutory scheme" are "not . . . matter[s] of 'discretionary judgment'" under Section 1226(e)); *Zadvydas*, 533 U.S. at 688 (holding that "the extent of the Attorney General's authority" to detain a noncitizen under a statute "is not a matter of discretion"); *see also Hernandez v. Sessions*, 872 F.3d 976, 987 (9th Cir. 2017) (holding that Section 1226(e) "does not . . . preclude habeas jurisdiction over constitutional claims or questions of law") (internal quotation marks and citations omitted); *Hernandez-Lara*, 10 F.4th at 32 (citing favorably to *Hernandez v. Sessions*). These precedents support the common-sense proposition that executive officials applying detention authority under 8 U.S.C. § 1226(a) lack unreviewable "discretion" insulated from judicial review to violate statutory and constitutional restraints.

In *Wilkinson*, the Supreme Court made clear that 8 U.S.C. § 1252(a)(2)(B)'s restriction on review of discretionary determinations does not strip courts of jurisdiction to hear challenges to the legal question of the application of a set of facts to a legal standard. In *Wilkinson*, an IJ had determined that a noncitizen had not established facts sufficient to meet the legal standard for one of the eligibility requirements for cancellation of removal, that his removal would cause "exceptional and extremely unusual hardship" to a U.S. citizen or legal permanent resident, 8 U.S.C. § 1229b(b)(1)(D). *Wilkinson*, 601 U.S. at 216. The IJ denied relief without reaching whether the noncitizen merited a favorable exercise of discretion. *Id*. The noncitizen filed a PFR challenging the determination and the Third Circuit held that Section 1252(a)(2)(B) stripped it of jurisdiction to hear the challenge because the hardship determination was "discretionary." *Id.* The Supreme Court reversed, finding that application of a legal standard to a set of established facts is

a not a "discretionary" determination, but instead a reviewable question of law. *Id.* at 217–218, 221, 225 ("The hardship determination in this case was not discretionary."). A contrary rule would lead to the absurd result of "effectively foreclose[ing] judicial review of the [Immigration Court's] determinations so long as it announced the correct legal standard." *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020).

*Wilkinson* makes clear that Petitioner's sufficiency-of-the-evidence claims – both as to the initial finding of dangerousness and the finding that no alternative conditions to detention could sufficiently mitigate that alleged dangerousness, raise questions of law, not of discretionary judgment that fall within the sweep of Section 1226(e). Just as in *Wilkinson*, the challenge here addresses not a matter of discretion, but the application of a "legal standard" (here, whether there is clear and convincing evidence of danger to the community) "to a given set of established facts" (the facts before the IJ in the bond hearing). *See Wilkinson*, 601 U.S. at 217.s

In addition, as demonstrated in the chart attached as Exhibit A, district courts in the First Circuit have likewise repeatedly held that Section 1226(e) does not strip the federal court of jurisdiction to review challenges to bond denials like Petitioner's and have reviewed these claims to determine whether any reasonable arbiter could have found the evidence sufficient. *See, e.g.,* A*lvarez v. McDonald*, 26-cv-14042-BEM (D. Mass. Oct. 5, 2026), Dkt. #32 (text order) (holding that where Petitioner challenges the constitutionality of his bond determination, the Petitioner must show that "as a matter of law, no reasonable IJ could have found that evidence proved by a clear and convincing evidence that Petitioner is a danger to the community, or that the process provided was constitutionally insufficient." [citations omitted]); *Higiro v. Nessinger*, 26-cv-00105, 2026 U.S. Dist. LEXIS 52268, * 10-11 (D.R.I. Mar. 13, 2026) (finding court has jurisdiction to review petitioner's claim that the IJ violated his due process rights by failing to

consider release conditions before denying bond, and citing cases in accord).” *Id.* Petitioner submits that this is exactly what is happening here.

D. <u>Petitioner’s claims that the record at her custody hearing was insufficient as a matter of law to meet the clear and convincing standard can be heard in habeas jurisdiction.</u>

Likewise here, Petitioner’s habeas petition attacks the lawfulness of her detention on the ground that her custody hearing was legally insufficient and thus can be addressed by this Court in habeas jurisdiction. *First*, the Motion to Enforce raises a claim that the record was insufficient as a matter of law to show dangerousness by the clear and convincing evidence. This is exactly the type of issue that *Wilkinson* held is a reviewable question of law, not an unreviewable “discretionary” decision subject to jurisdiction-stripping. 601 U.S. at 217–18.

*Second*, the Motion to Enforce raises claims that the IJ’s decision lacked sufficient evidence and applied the wrong standard by failing to meaningfully address conditions of release and failing to require DHS to meet its burden of providing clear and convincing evidence that her release would cause danger to the community that could not be mitigated by the effects of such conditions. App. 11–12, 14-15, 19–21. These claims fall straightforwardly under the Section 1226(e) holdings of *Hernandez-Lara*, *Preap*, *Jennings*, and *Demore*.

E. <u>The presumption in favor of judicial review, the canon of constitutional avoidance, and the plain statement rule reinforce that Section 1226(e) does not apply to the claims raised here.</u>

The presumption of judicial review, the canon of constitutional avoidance, and the clear statement rule further support the conclusion that Section 1226(e) does not bar claims like those of the Petitioner here challenging unlawful detention based on errors of law.

*First*, there is a “strong presumption of judicial review of administrative action.” *INS v. St. Cyr*, 533 U.S. 289, 298 & n.9 (2001). Because Section 1226(e) purports to “entirely eliminate[]

judicial review" of claims that fall within its sweep, interpreting it requires applying that presumption. *See Kong*, 62 F.4th at 615 (discussing Section 1252(g)).

*Second*, under the canon of constitutional avoidance, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,'" courts "are obligated to construe the statute to avoid such problems. *St. Cyr*, 533 U.S. at 299–300 (citations omitted); *see also Wilkinson*, 601 U.S. at 218 n.3. Here, the Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., art. I, § 9, cl. 2. The Suspension Clause "ensures that, except during periods of formal suspension, the Judiciary will have a time-tested device, the writ, to maintain the delicate balance of governance that is itself the surest safeguard of liberty." *Boumediene v. Bush*, 553 U.S. 723, 745 (2008) (internal quotation marks and citations omitted). Because interpreting Section 1226(e) to preclude habeas claims like those of the Petitioner based on errors of law would not just raise a serious constitutional question but directly violate the Suspension Clause, *see infra* at 31–33, this Court must avoid that interpretation if another is fairly possible.

*Third*, the Supreme Court has established a "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *St. Cyr*, 533 U.S. at 298. Here, Section 1226(e) does not define what is and is not a "discretionary" decision. It contains no clear statement that IJs have "discretion" to apply the wrong legal standard in bond cases, that IJs have "discretion" to apply the standard incorrectly, or that what constitutes a "discretionary" decision under 8 U.S.C. § 1226(e) should be given a broader construction than any other INA jurisdiction-stripping provision limited to "discretionary" decisions.

These canons of statutory interpretation preclude giving Section 1226(e) a reading preventing review here or otherwise departing from the clear precedents of the Supreme Court and this Court: questions of law are not unreviewable discretionary decisions protected from judicial review under Section 1226(e).

F. If Section 1252(b)(9) or 1226(e) did by their own terms strip the court of jurisdiction to hear these claims—they do not—they would violate the Suspension Clause.

Finally, if Section 1252(b)(9) or Section 1226(e) *did* by their own terms apply to the Petitioner's claims—they do not—they would violate the Suspension Clause.

Where a statute by its own terms strips courts of jurisdiction to hear habeas petitions, courts follow a two-step analysis to determine if the statute violates the Suspension Clause.

*First*, courts ask whether the petitioner and their claims fall within the scope of Suspension Clause protections. *Compare Boumediene,* 553 U.S. at 771 (holding alleged enemy combatants detained at Guantanamo Bay, Cuba were within the scope of the Suspension Clause) *with Johnson v. Eisentrager*, 339 U.S. 763, 777, 781 (1950) (holding noncitizens who had never been to the United States and who were captured and detained outside the United States as prisoners of war, fell outside the scope of the Suspension Clause).

*Second*, courts ask whether Congress has provided an "adequate substitute for habeas corpus." *Boumediene*, 553 U.S. at 771–72, 779. At a minimum, an adequate substitute entitles a person detained by the executive "to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law," and to the availability of remedies including, but not limited to, release. *Id.* at 779 (quoting *St. Cyr*, 533 U.S. at 302). The required procedural safeguards are particularly demanding in cases of executive detention, as opposed to detention following criminal process. *Id.* at 783. In executive detention cases, "[t]he

habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain." *Id.* at 783

Here, at the first step, it is beyond dispute that noncitizens like Petitioner—who was admitted to the United States more than 10 years ago and has lived here continuously since—are within the reach of the Suspension Clause. *See, e.g., Shaughnessy v. U.S. ex rel Mezei,* 345 U.S. 206, 212 (1953); *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). Further, this type of challenge falls within the Suspension Clause's protections, because review of the "erroneous application . . . of statutes" in carrying out executive detention was "the kind of review traditionally available in a habeas proceeding." *Wilkinson*, 601 U.S. at 223 (internal quotation marks and citations omitted).

At the second step, there are no "adequate substitute procedures for habeas corpus" that noncitizens like Petitioner can use to challenge erroneous interpretations or applications of the applicable bond standard, because the extension of 1252(b)(9) to detention claims would make them effectively unreviewable, and because Section 1226(e) entirely bars courts from hearing claims that fall within its sweep. *Boumediene*, 533 U.S. at 771. Accordingly, even if this Court read Section 1252(b)(9) or Section 1226(e) to preclude habeas actions like these, there would be jurisdiction under the direct authority of the Suspension Clause.

## II. ADMINISTRATIVE REMEDIES ARE INADEQUATE AND FUTILE.

In addition, exhaustion of administrative remedies here should not be required because an appeal to the Board of Immigration Appeals (BIA) of the adverse custody determination is not a sufficient remedy for Magalita's detention, both because of the irreparable harm it has and would inflict through detention during the lengthy appeal and because such an appeal is plainly futile.

### A. There is no statutory exhaustion requirement.

First, no statutory exhaustion requirement governs Petitioner's statutory and due-process challenge to her detention. *See Brito v. Garland*, 22 F.4th. 240 , 255 (1st Cir. 2021) (noting that no

statutory exhaustion applies to "pre-removal-order due process claims" in noncitizen's habeas petition); *Gomes v. Hyde*, 804 F. Supp. 3d 265, 272 (2025) (noting that exhaustion is not statutorily required for challenge to detention without appealing negative bond hearing); *Sampiao v. Hyde*, 799 F. Supp. 3d 14, 25 (D. Mass. 2025) ("Since exhaustion, as the government recognizes, is not required by statute in this context, its exhaustion argument is measured against the 'more permissive' common-law, rather than statutory, exhaustion standard").

B. The lengthy BIA appeal process is insufficient to address the irreparable harm of ongoing wrongful deprivation of liberty.

Magalita would suffer irreparable harm from her detention such that exhaustion should not be required. *See Sampiao,* 799 F. Supp. 3d at 25 ("Irreparable harm may be established where a petitioner will be incarcerated or detained pending the exhaustion of administrative remedies"), *Brito*, 22 F.4th at 256 ("[E]xhaustion might not be required if [the petitioner] were challenging her incarceration . . . or the ongoing deprivation of some other liberty interest." (internal quotations and citation omitted).

Appeals to the BIA concerning custody redeterminations usually take at least six months to a year. *See Picado v. Hyde*, 2026 U.S. Dist. LEXIS 27155, at *12-13 (D.R.I. Feb. 9, 2026) ("This loss of liberty is further compounded due to the considerable amount of time—up to six months, in many cases—it takes for the BIA to decide bond appeals."); *Miti v. Moniz*, 827 F. Supp. 3d 206, 216 (D. Mass. 2026) ("In 2024, - before the recent surge in immigration detention – Executive Office for Immigration Review data showed an average processing time of 204 days for bond appeals and that 200 bond appeal cases took a year or longer") (quotation marks and citations omitted); *Rodriguez v. Bostock*, 802 F. Supp. 3d 1297, 1307 (W.D. Wash. 2025) (finding that, [i]n 2024, EOIR data showed an average processing time of 204 days for bond appeals," and that "EOIR data between 2015 and 2024 also showed that 200 bond appeal cases "took a year or longer

to resolve”). That is *longer* than the normal time than detained removal proceedings usually take. Acacia Ctr. for Just., *Trends in Case Times of People Facing Deportation in U.S. Immigration Court: Through December 2025*, at 5 fig.3 (Sept. 14, 2026), https://acacia justice.org/wp-content/uploads/2026/09/Public-FactSheet_ CaseTimes_ Final_ 20260914-December-1.pdf (finding that in, based on EOIR’s own data, in 2025, the median time for a detained removal case to proceed from an initial hearing to a determination by an IJ was 144 days). Accordingly, in a typical case, by the time a BIA reached a decision in a custody determination, all of “the allegedly excessive detention would have already taken place.” *Jennings*, 583 U.S. at 293.

C. The BIA bond appeal process would be futile.

The appeal process is also likely to be futile since the BIA may not consider such constitutional questions and there is no review to a circuit court. *See, e.g., Cesvette v. Moniz*, 2026 U.S. Dist. LEXIS 191097, *6 (D. Mass. Aug. 25, 2026) (“Exhaustion would also be futile here. Petitioner challenges the legality of his detention and the constitutional adequacy of the hearing the IJ conducted – questions the BIA lacks the authority to meaningfully adjudicate”); *Mujica-Marquez v. Hoover*, 2026 U.S. Dist. LEXIS 116062 (M.D. Penn. May 27, 2026) (“[I]t is not at all clear that the BIA could evaluate the legality of the IJ’s bond determination in relation to a [district court’s order] – the BIA has, for example, consistently refused to reach and decide constitutional questions.” (cleaned up); *Y.S.G. v. Andrews*, 2025 U.S. Dist. LEXIS 208276 (E.D. Cal. Oct. 22, 2025) (same); *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 238 (W.D. N.Y. 2019) (“[A]s the government has admitted, ‘the BIA does not have jurisdiction to adjudicate constitutional issues.’”).

In any event, as discussed above, there is no appeal of a negative custody decision from the BIA to an Article III court. As this Court has noted,

> [T]here is no available appeal of a BIA decision as to custody to the circuit court. "[H]earing officer decisions (subject to limited habeas review in this Court and review of this Court's decision on habeas petitions by the First Circuit) is essentially the end of the administrative line inasmuch as the "courts of appeal do not have independent jurisdiction to review BIA bond decisions." *See Romero v. Hyde*, 795 F. Supp. 3d 271, 278 (D. Mass. 2025) (Murphy, J.).

*Mijangos, v. Wesling,* 2026 U.S. Dist. LEXIS 220388, n.1 (D. Mass. Sept. 22, 2026). "[A] petition for a writ of habeas corpus, filed in the appropriate district court, is the only mechanism by which a noncitizen may seek judicial review of an IJ's bond decision." *Mayancela v. FCI Berlin,, Warden*, 2025 U.S. Dist. LEXIS 226280, *9-10 (D. N.H. Nov. 18, 2025) (citations omitted). *See also Gudiel Polanco v. Garland*, 839 F. App'x 804, 805 (4th Cir. 2021) (explaining that the appeals court has jurisdiction to review "final orders of removal or deportation," not "request[s] for release on bond"); *Gomez De Chacon v. Barr*, 828 F. App'x 459, 460 (9th Cir. 2020) ("[T]his court does not adjudicate bond or custody status through a petition for review.").

D. <u>The Immigration Courts, including the BIA, have demonstrated that they are not impartial arbiters, but acting as an arm of the Administration's mass deportation efforts.</u>

Immigration courts decide some of the most important rights and privileges in our society – the privilege to live in this country, with their family, and raise generations to come here. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 365-66 (2010) ("We have long recognized that deportation is a particularly severe "penalty""). As the Supreme Court in *Padilla* recognized, the consequences of deportation are so severe, even in comparison to criminal convictions, that "[p]reserving the clients right to remain in the United States may be more important to the client than any potential jail sentence." *Id.* (citations omitted)). Return for certain immigrants may threaten not only their entire future here, but also their lives by subjecting them to persecution and torture. Immigrants are also subjected to prolonged detention by the immigration process.

"Federal courts have begun to recognize 'mounting evidence that bond determination hearings conducted in Immigration Court . . . have preordained outcomes.'" *Timbigamba v. FCI Berlin,* 2026 U.S. Dist. LEXIS 115010, *29 (D.N.H. May 26, 2026 (quoting *Singh v. Valdez*, No. 1:26-cv-1109-WJM, at *10-11 (D. Colo. Apr. 1, 2026), *Atariguana-Buele*, 2026 U.S. Dist. LEXIS 141138, *5-6 (D. Mass. June 25, 2026) (citing repeated failures by IJ to adhere to constitutional requirements when conducting bond hearings). In this case as well, the IJ denied bond, even in the face of a record that relied solely upon unproven charge over a family argument that does not come close to clear and convincing evidence of dangerousness.

"The Due Process Clause requires that [noncitizen]s 'threatened with deportation' are provided with the right to 'a full and fair hearing.'" *Sanchez-Cruz v. INS*, 255 F.3d 775, 779 (9th Cir. 2001) (citation omitted)). "A neutral judge is one of the most basic due process protections." *Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2001); *see also Wang v. Att'y Gen. of U.S.*, 423 F.3d 260, 267–68 (3d Cir. 2005) (noting the duty of IJs to remain neutral and impartial when they conduct immigration hearings). However, the Executive Branch has made clear that IJs are expected to effectuate the President's mass deportation agenda and act as "deportation judges."[4]

---

[4] See, e.g., Nicholas Nehamas, et al., *How Trump Purged Immigration Judges to Speed Up Deportations*, NEW YORK TIMES (Apr. 9, 2026), https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-judges-purge.html; Priscilla Alvarez, *Inside the Trump administration's unprecedented purge of immigration judges*, CNN (Oct. 6, 2025), https://edition.cnn.com/2025/10/06/politics/immigration-judges-fired-trump; *Trump Administration Continues Firing Immigration Judges -- IFPTE responds*, INTERNATIONAL FEDERATION OF PROFESSIONAL & TECHNICAL ENGINEERS (Sep. 26, 2025), https://www.ifpte.org/news/trump-administration-continues-firing-immigration-judges-ifpte-respondsnbsp (reporting that as of February 17, 2026, at least 139 of 700 IJs were terminated, involuntarily relocated, or took an early-out offer, accounting for nearly 20% of all IJs); https://www.washingtonpost.com/immigration/2026/04/27/justice-department-immigration-judges-deportation/

Unbiased arbiters are a critical requirement of due process in the critical area of civil detention and the deprivation of liberty of massive numbers of noncitizens.

In addition, the BIA apparently has not ruled in favor of a noncitizen in approximately 97% of the 100 precedential decisions from January 31, 2025 through April 29, 2026. *See* Cade, J., "Welcome to the Trump Administration's Board of Immigration Appeals. The Immigrant Always Loses." 136 *Yale Law Journal*, September 25, 2026. https://yalelawjournal.org/essay/welcome-to-the-trump-administrations-board-of-immigration-appeals-the-immigrant-always-loses-forum. As noted in this article, "[t]he exhaustion doctrine's justifications also collapse when the administrative body to be exhausted has been rebuilt to foreordain a result." *Id. at 29.* As this article explains, the Trump Administration has reduced the members of the BIA from 28 to 15, and fired all judges appointed during the Biden Administration. *Id* at 26-27.

The article reviews the 100 precedential appellate decisions published by the BIA and Attorney General (AG) Bondi between January 31, 2025 and April 29, 2026 and concludes that they "reveal an unmistakable pattern. No matter what an immigrant suffered, no matter what Congress intended, no matter what the hearing-level judge found, the answer is removal." *Id.* at 25. The article further concludes that these decisions are "a crucial component of the Trump Administration's systematic dismantling of the protections built into immigration law." *Id.* at 26.

Moreover, in performing that review, district courts of the First Circuit have concluded that the IJ's proceedings failed to meet the constitutional standards in more than half of the cases – more than 60 times, most in the last year – which is another indication that the immigration courts

are not following the law in their role as "deportation judges." For this reason as well, this Court should not require exhaustion or give undue deference to a process that is clearly futile.

## IV. THE IJ'S DANGEROUSNESS DECISION HERE WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE, EVEN WITHOUT CONSIDERATION OF ALTERNATIVES TO RELEASE.

To obtain habeas relief on a Motion to Enforce, the noncitizen "must show that the IJ 'failed to place the burden of proof on the Government' to either show dangerousness by clear and convincing evidence or flight risk by a preponderance of the evidence." *Mayancela*, 2025 U.S. Dist. LEXIS 226280, at *12 (citation omitted). A petitioner can generally make this showing by demonstrating (1) that the IJ "erred because the evidence itself could not—as a matter of law—have supported" the IJ's decision to deny bond, or (2) that the IJ "simply did not apply the correct standard to the facts." *Garcia v. Hyde*, 817 F. Supp. 3d 112, 126 (D.R.I. 2025) (citations omitted). As Judge Gorton has explained, "[r]elief is thus appropriate where the IJ's decision is 'so arbitrary it would offend fundamental tenants of due process' such that no reasonable IJ could come to that conclusion." *Tiu v. Wesling*, 2026 U.S. Dist. LEXIS 236872 (D. Mass Oct. 15, 2026) (holding that finding that petitioner was a flight risk based upon alleged assault charges was arbitrary and "an unreasonable inference based on the facts in the record").

By failing to recognize the lack of sufficient or corroborating evidence and the lack of actual evidence of any significant danger, the IJ committed errors of law that directly led to Magalita's wrongful detention and thus can be remedied by habeas relief.

### A. <u>The Clear and Convincing Standard for Dangerousness Is a High Standard.</u>

The clear and convincing evidence standard is "greater than the preponderance-of-the-evidence standard applicable to other categories of civil cases." *Addington v. Texas*, 441 U.S. 418, 433, 425 (1979). It is "a demanding standard to satisfy." *United States v. Anonymous*

*Appellant*, 85 F.4th 576, 580 (1st Cir. 2023) (citations omitted). To meet it, the evidence must support an "abiding conviction" that the relevant proposition is "highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (internal quotation marks and citation omitted). It requires showing not just that an outcome is more likely than not, but that it is "reasonably certain." *Díaz-Alarcón v. Flández-Marcel*, 944 F.3d 303, 306 n.5 (1st Cir. 2019) (internal quotation marks and citation omitted).

*Second*, a finding of "danger to the community" by clear and convincing evidence must rest on an "identified and articulable threat to an individual or community." *Salerno*, 481 U.S. at 751. The risk of future harm must be significant. *See United States v. Patriarca*, 948 F.2d 789, 792–93 (1st Cir. 1991) (upholding district court's determination in criminal bail hearing that the government had not proved dangerousness by clear and convincing evidence because they had not proved that "*this* [*defendant*] posed a significant danger, or at least not a danger that could not be overcome given appropriate conditions"). In the *Patriarca* case, the First Circuit held that a former mafia boss was not such a significant danger that he could not be released on conditions.

B. <u>The evidence before the IJ here was insufficient, as a matter of law, to meet the clear and convincing standard for proof of dangerousness.</u>

Taken together, the government was required to prove that it is highly probable or reasonably certain that Magalita's release from detention will bring about an identified, articulable, and significant risk of danger to the community that no conditions of release could sufficiently ameliorate. This record simply could not support such a conclusion. There is no significant danger identified on this record from Magalita, a mother of three, accused of nothing more than a single slap to her 18-year-old son with no injury. Nor can any reasonable person view the risk of future harm from a mother's slap of her son with no injury as a "significant danger."

The dangerousness finding relied solely on an isolated alleged slap of the Petitioner's son, after an argument it which there was undisputed statements that the son had pushed his mother in a tussle over a bag and an argument about his not doing the dishes. Even taking these allegations at their worst interpretation, (a) they were not independently corroborated and (b) they do not demonstrate significant dangerousness to the clear and convincing standard.

Deference to the evidence weighing of an IJ does not require checking common-sense at the door. Here, there was no testimony and the IJ made conclusions from an uncorroborated police report with no sworn statement or opportunity to cross-examine that statement. Such reliance upon uncorroborated statements and minor charges has been repeatedly rejected by courts in this circuit as sufficient to demonstrate dangerousness by clear and convincing evidence.

"Adjudicating whether to detain or release another person is one of the most serious tasks judges are asked to perform. It requires conscientious review and consideration of <u>all</u> relevant and available information." *Atariguana-Buele* 2026 U.S. Dist. LEXIS 141138, *6 (and ordering release where IJ denied bond based on "a single, unresolved criminal charge, despite a state-court judge having released Atariguana-Buele on conditions including a no-contact order."); *De Oliveira v. Moniz*, 2026 U.S. Dist. LEXIS 162316, at *3-4 (D. Mass. July 22, 2026) (finding IJ's determination of dangerousness unsupported by clear and convincing evidence even where police report reported that police observed petitioner drunk and arguing with his wife and visible blood stains on his shirt, but not the altercation); *Guevara v. Moniz*, 2026 U.S. Dist. LEXIS 154085, *3-4 (D. Mass. July 13, 2026) (finding police reports lacked sufficient indicia of reliability to support a reasonable conclusion despite some observations and witness statement in domestic incident); *Miti*, 827 F. Supp. 3d 206, 219 (finding evidence in police reports insufficient to support a determination of dangerousness by clear and convincing evidence in part based on "an objective

lack of corroboration"); *Aguilar v. McDonald*, 2026 U.S. Dist. LEXIS 128819, at *3 (D. Mass. June 5, 2026) (holding that IJ "failed to meaningfully engage with the petitioner's substantial evidentiary submissions and arguments in support of his request for bond."); *Aguirre v. Moniz*, 2026 U.S. Dist. LEXIS 139990, *2-3 (D. Mass May 21, 2026) (rejecting reliance upon a single police report describing recent arrest on pending domestic assault charges). *See also* Exh A (listing many cases rejecting domestic assault charges or police reports thereof as sufficient evidence to demonstrate dangerousness by clear and convincing evidence).

"Not every person with a pending"—let alone dismissed—"criminal charge poses a danger to the community," and allegations of a domestic dispute do not necessarily and automatically render the petitioner "a danger to the community writ large, or [even] to his family." *Atariguana-Buele*, 2026 U.S. Dist. LEXIS 141138, *6, n.1-2; *Miti v. Moniz*, 827 F. Supp. 3d at 218 (rejecting conflicting evidence as to domestic incident as sufficient for clear and convincing standard).[5]

Moreover, here, the police report upon which the IJ relied was not only filled with contradictions and inconsistencies but was by itself simply insufficient to establish the facts upon which the IJ relied. Two of the IJ's findings in particular are contrary to law as lacking sufficient evidence to demonstrate dangerousness by clear and convincing evidence:

---

[5]Under Massachusetts law, a parent or guardian may use reasonable force against a child if it is reasonable and reasonably related to a legitimate purpose. See https://www.mass.gov/doc/9250-parental-discipline/download. *See also Commonwealth v. Dorvil*, 472 Mass 1 (2015) (recognizing the existence of the parental discipline privilege). Although not strictly applicable here because the son is eighteen-years old, the concept that parental discipline of a child can include a slap such as is alleged to occur here and thus be reasonable and not evidence of dangerousness to the community was not even considered by the police or the IJ. It cannot be clear and convincing evidence of dangerousness for a mother to act towards her tall and strong 18-year-old in a way that would be clearly legal to do with the same child a few months earlier, or even to a much younger and smaller child.

(1) Although the police officer reported reviewing a video, she apparently did not preserve it and it *was not* before the IJ for viewing or cross-examination. Thus, contrary to the IJ's conclusion, there was no independent corroboration of the police officer's report.

(2) In any event, an allegation of a single slap of an 18-year-old son with no injury in a minor argument simply is not evidence of significant dangerousness to the community by clear and convincing evidence.

In fact, the Commonwealth released Magalita the same night it arrested her and she appeared on her own in court the next day. Thus, the court and law enforcement officials charged with assessing the dangerousness already concluded that it did not demonstrate dangerousness – with good reason. *See Miti*, 827 F.Supp. 3d at 218-219 (noting that arresting officer's determination of modest bail do not support strong inference that arresting office perceived petitioner as dangerous on an ongoing basis). Moreover, in this case, there was not a single other thing in the record suggesting dangerousness that could be added to this allegation to reach a clear and convincing standard. To the contrary, the record was filled with evidence of Magalita's kindness and dedication to the residents of the group home where she works.

Clear and convincing does not mean that it is a fig leaf that an immigration judge under pressure to detain and deport as many people as possible can use as an excuse to detain a person who obviously should be permitted to go home to her 12-year-old U.S. citizen daughter – who was left with a neighbor and taken in by a kind friend. The danger to the community – it is clear and convincing, is not from releasing Magalita, but from detaining her.

## V. THE IJ'S DECISION LACKED REQUIRED EVIDENTIARY SUPPORT BECAUSE IT LACKED ANY DEMONSTRATION OR EXPLANATION OF WHY CONDITIONS OF RELEASE COULD NOT MITIGATE ANY RISK.

The IJ's decision was also incorrect as a matter of law because there was no evidence in the record from which the IJ could find that there were no alternatives to detention ("ATD") that could sufficiently mitigate any risk of dangerousness and the IJ's decision does not reflect any consideration of that issue other than the conclusory denial.

A. Section 1226(a) requires an IJ to consider release conditions as part of weighing whether to grant release on bond, but the IJ failed to do so.

Under the statute, DHS is required to prove that the Petitioner is a danger to the community notwithstanding the mitigating effects of any potential conditions of release. The text of Section 1226(a) requires an IJ performing a custody redetermination to consider "conditions" of release as part of weighing whether to grant release on bond. 8 U.S.C. § 1226(a)(2)(A).

The statute lays out three custody dispositions and requires that the official delegated the authority of "the Attorney General"—here, the IJ—elect between them. That includes considering under Section 1226(a)(2)(A) "prescrib[ing]" "conditions" of release as part of weighing whether to select release on bond. 8 U.S.C. § 1226(a)(2)(A); *Hernandez-Lara*, 10 F.4th at 29 (describing release on bond under 8 U.S.C. § 1226(a)(2)(A) as "supervision under release conditions") (internal quotation marks and citations omitted); *see also Matter of Garcia-Garcia*, 25 I. & N. Dec. 93, 97 (BIA 2009) (providing that the term "conditions" as used in 8 U.S.C. § 1226(a)(2)(A) refers to "conditions on an alien's release from custody"). As the name itself suggests, weighing whether to grant conditional parole under Section 1226(a)(2)(B) likewise requires considering conditions of release. *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1112, 1115–1116 (9th Cir. 2007) (holding that a noncitizen who DHS detained inside the United States, placed into removal proceedings, and then released from detention on a Form I-220A imposing conditions of release but no bond had been released on "conditional parole" under Section 1226(a)(2)(B)).

Accordingly, independent of the requirements of the Due Process Clause, the text of the statute requires an IJ performing a custody redetermination to consider release conditions. *Hernandez-Lara*, 10 F.4th at 29 (explaining that "the choice" an IJ performing a custody redetermination under Section 1226(a) makes "is not between imprisonment and living at large in this country, but between imprisonment and supervision under release conditions that may not be

violated") (internal citation and quotation marks omitted).

Because the statute *itself* requires the IJ to consider release conditions, bond denial is justified only where DHS has proved that no combination of bond and release conditions can mitigate the danger to the community and flight risk. Given that IJs must "prescribe[]" "conditions" as part of granting bond, if DHS only proves that there would be danger to the community or flight risk *absent* such conditions, it has not met its burden to justify a bond denial. A bond denial can only be justified if DHS proves that *no* combination of bond and release conditions could reasonably mitigate danger to the community (by clear and convincing evidence) or flight risk (by a preponderance of the evidence) can a bond denial be justified.

Here, DHS failed to even address potential standard conditions of release for domestic incidents such as a stay-away order between mother and son. There was no evidence in the record and no finding by the IJ as to why such a condition was insufficient. Thus, for this reason as well, the IJ's decision is unsupported by sufficient evidence to show, by clear and convincing evidence, that Magalita would be a danger to the community *even with such conditions*.

B. <u>The Due Process Clause incorporates into the clear and convincing burden of proof a requirement to prove that no combination of conditions can reasonably assure community safety, but the IJ failed to hold DHS to that burden.</u>

In addition, to justify ongoing detention of a noncitizen detained under Section 1226(a) based on dangerousness, and under the due process clause, DHS must prove danger to the community by clear and convincing evidence *accounting for the mitigating effects of release conditions.* Thus, DHS must prove not just that the noncitizen is dangerous absent any conditions,

but that *releasing* the noncitizen with such conditions would cause danger to the community because no combination of bond and release conditions could reasonably assure community safety.

This conclusion: (1) follows from the First Circuit's holding in *Hernandez-Lara* regarding the allocation of burdens of proof required under the Due Process Clause in custody redeterminations of noncitizens detained pursuant to Section 1226(a); and (2) is required under a balancing of the *Mathews* factors and necessary to ensure that ongoing detention is reasonably related to a permissible purpose of civil detention.

1. *First Circuit authority requires proof of dangerousness by clear and convincing evidence, even with conditions of release.*

In *Hernandez-Lara*, the First Circuit determined that, to justify ongoing detention, the government must either prove by clear and convincing evidence that a noncitizen's release would cause danger to the community or prove by a preponderance of the evidence that the noncitizen is a flight risk. *Hernandez-Lara*, 10 F.4th at 24, 28, 40.

In *Brito v. Garland,* 22 F.4th 240 (1st Cir. 2021), the First Circuit threw cold water on the government's view that an IJ does not need to consider alternatives to detention if the IJ determines that an individual is a danger to the community, or that the two inquiries could logically be separated at all. 22 F.4th at 254. Such a view "appears to put the cart before the horse," the court explained, because "it is easy to see how conditions of release might shape an IJ's determination as to whether a noncitizen poses a flight risk or danger to the community." *Id.* (citation omitted).

This conclusion is further supported by the Ninth Circuit's decision in *Hernandez v. Sessions*, 872 F.3d 990-94, and numerous district court decisions, including many within the First Circuit.[6]

It is not sufficient for the IJ to merely hold a hearing, hear evidence and argument, and recite the clear and convincing evidence legal standard. Accepting that premise would effectively foreclose judicial review, risk reducing immigration court bond hearings to meaningless box-checking exercises, and raise a serious constitutional question under the Suspension Clause.

Here, the IJ never meaningfully addressed alternatives to detention. Instead, his order flatly recited that no conditions could reasonably ensure the safety of the community. Simply asserting that there is no alternative to detention where, as here, there clearly are such potential conditions routinely used in domestic disputes, cannot meet the requirements of due process and the burden on the government to show that such alternatives cannot sufficiently mitigate the risks. *See, e.g., Akinsanya v. Garland*, 125 F.4th 287, 297 (1st Cir. 2025) ("Merely stating the proper standard does not discharge the obligation to correctly apply the standard"); *De Oliveira,* 2026 U.S. Dist. LEXIS 162316, *5 ("[A]lthough the immigration judge's order states perfunctorily that 'no alternative to detention exists that would ensure the safety of the community,' [], she did not meaningfully consider if there were any alternatives to detention that could address the risk of danger posed by Petitioner."); *S.E. v. Noem*, 2026 U.S. Dist. LEXIS 46065, at *11-12 (concluding

[6] *See, e.g.*, *Lopez Perez v. Wesling*, 1:26-cv-12268-IT, ECF No. 16, Memo. & Order, at 5 (D. Mass. Aug. 6, 2026); *Higiro*, 2026 U.S. Dist. LEXIS 52268, at *10-11; *Costa v. McDonald*, 2026 U.S. Dist. LEXIS 27125, *5-6 (D. Mass. Feb. 10, 2026) (listing cases); *Brito*, 415 F. Supp. 3d at 267, *aff'd in part, vacated in part on other grounds*, *Brito*, 22 F.4th 240; *Reid v. Donelan*, 390 F. Supp. 3d 201, 225 (D. Mass. 2019), *aff'd in part, vacated in part on other grounds*, 17 F.4th 1 (1st Cir. 2021); *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 241–242 (W.D.N.Y. 2019); *Ousman D. v. Decker*, 2020 U.S. Dist. LEXIS 171243, *9-10 (D.N.J. Sept. 18, 2020). *See also.* Exh. A (listing more cases requiring consideration of ATD).

that IJ's statement of the standard was mere lip service and the IJ committed legal error because there was no evidence of risk of flight.). As this Court has noted,

> [I]f express findings are **not** constitutionally required it becomes well-nigh impossible -- at least in the face of the conclusory determination that 'no combination of conditions will secure the presence of the petitioner' -- to figure out whether the immigration hearing officer implicitly considered but rejected alternatives (constitutional but subject only to limited APA review before the Board of Immigration Appeals) or ignored the matter altogether (unconstitutional, properly reviewable at the BIA or in the district court on habeas).

*Mijangos*, 2026 U.S. Dist. LEXIS 220388, *2. *See also Tiu*, 2026 U.S. Dist LEXIS 236872, *7 ("Although the IJ 'need not discuss ad nauseum every piece of evidence', his reasoning must be clear from and supported by the record.").

Here, the IJ did not even discuss the most obvious remedy used in many far more serious domestic disputes of having the parties stay away from each other. *See, e.g., Atariguana-Buele*, 2026 U.S. Dist. LEXIS 141138, n.2 ("One obvious alternative to detention in the context presented, with which IJ Dubuc did not engage, would be an order requiring Atariguana-Buele to live elsewhere"). This is not sufficient to demonstrate genuine consideration of alternatives to detention or permit any meaningful review of that decision.

2. *Due Process Requires More Than Lip Service As to Conditions of Release.*

A *Mathews* due process analysis confirms that a bond denial can only be justified based on dangerousness if DHS proves by clear and convincing evidence that no combination of a bond and release conditions could reasonably ensure community safety.

Inquiries into whether immigration bond procedures meet the minimum requirements of due process are "guided by the three-part balancing test articulated in *Mathews v. Eldridge*." *Hernandez-Lara*, 10 F.4th at 27–28 (additionally citing *Addington,* 441 U.S. at 425 (1979), which looked to *Mathews* in analyzing what burden of proof due process required to justify involuntary

commitment and finding it required clear and convincing evidence of danger to the community). "The *Mathews* factors are: (1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Hernandez-Lara*, 10 F.4th at 28 (quoting *Mathews*, 424 U.S. at 335).

Regarding the first factor, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S at 690. Accordingly, "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protections." *Addington*, 441 U.S. at 425 (citations omitted).

Here, this factor takes on even greater significance, because Magalita is the sole caretaker for her 12-year-old daughter. Detaining Magalita and removing her from her child and community is a severe deprivation. As in *Hernandez-Lara*, this factor weighs heavily in Magalita's favor. *See* 10 F.4th at 28–30. This is all the more so because detention under Section 1226(a) "can be quite lengthy," and "continues until all proceedings and appeals are concluded … even when an individual has prevailed and the Government appeals." *Id.* at 29–30 (noting the petitioner in *Hernandez-Lara* was detained for 10 months and would have been detained for two more years had the district court not granted release).

The second factor, the risk of erroneous deprivation of liberty, weighs heavily in Magalita's favor too. Detention of noncitizens in removal proceedings is only ever justified if there is a "reasonable relation" to a legally permissible purpose of detention—here, protecting community

safety and ensuring appearance of future hearings. *Zadvydas*, 533 U.S. at 690 (citation omitted). Further, "the Supreme Court has repeatedly affirmed that '[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" *Hernandez-Lara*, 10 F.4th at 28 (citations omitted). Finally, the Supreme Court has noted that the purpose of a burden of proof is "to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington*, 441 U.S. at 423. Accordingly, where the individual interest at stake is substantial—as here, where it is an individual's fundamental liberty interest in freedom from constraint—due process typically requires allocating more risk to the government actors seeking to deprive liberty than to the individual. *Id.* at 432–33 (holding that due process required the government to justify civil commitment by "clear and convincing evidence").

Furthermore, where some combination of bond and release conditions can reasonably assure community safety, detaining the noncitizen rather than releasing the noncitizen subject to those conditions would be punitive and unnecessary, not "carefully limited" or "reasonably related" to a permissible purpose of detention. Further, it would erroneously allocate the risk of unnecessary detention on the noncitizen.

In the analogous situation of criminal pre-trial detainees, the Bail Reform Act already requires the government to justify detention without bail by proving by clear and convincing evidence that "no condition or combination of conditions will reasonably assure" the safety of the community and future appearances. 18 U.S.C. § 3142(e)(1). The Supreme Court upheld the Act in *United States v. Salerno*, 481 U.S. 739 (1987), in significant part because it requires individualized determinations and consideration of whether "conditions of release can reasonably assure" community safety. *Id.* at 750–752. Accordingly, the safeguard of incorporating consideration of release conditions into the burden of proof produces a workable bond standard already employed

by countless judges in a similar context. And there is no reason people in purely civil proceedings should be subjected to a harsher standard "dangerousness" standard than people accused of serious federal crimes. *See Hernandez-Lara*, 10 F.4th at 28 (rejecting the proposition that a person's status as a noncitizen in civil proceedings justified preventative detention based on a lower burden of proof than for defendants in criminal proceedings).

The third factor, the government's interest, is either neutral or weighs in Magalita's favor. While the government does have a legitimate interest in the prompt execution of removal orders and in protecting community safety, those interests are not served by detention when the less restrictive alternative of release conditions could serve them as well, especially where, as here, Magalita has a pending asylum claim, which the government has been considering since 2017. Detaining her adds nothing to facilitate its prompt adjudication after so many years.

Further, this factor requires consideration of the relevant "fiscal and administrative burdens." *See Hernandez-Lara*, 10 F.4th at 28. Detaining noncitizens is extremely expensive, while supervised release is dramatically less expensive. ICE.gov, *Alternatives to Detention*, https://www.ice.gov/features/atd[7] ("The daily cost per ATD-ISAP participant is less than $4.20 per day—a stark contrast from the cost of detention, which is around $152 per day."); *see also* Mass. Off. of the Inspector Gen., *Final Report on Sheriffs' Budgets and Expenditures*, 106 (June 1, 2026), https://maoig.gov/resource/final-report-on-sheriffs-budgets-and-expenditures (noting that in 2024, ICE entered into a new agreement to detain noncitizens at Plymouth County Correctional Facility for "$215 per inmate per day"); *Hernandez-Lara*, 10 F.4th at 33 (citing ICE's 2018 budget overview for the proposition that, as of then, detaining a noncitizen cost "$134 per

[7] The "Alternatives to Detention" page remains live on ICE.gov but is now marked as "Archived Content" that comes "from a previous administration or is otherwise outdated" and is "not reflective of current practice."

person, per day"). Finally, as *Hernandez-Lara* noted, "unnecessary detention imposes substantial societal costs" too, including "separat[ing] families and remov[ing] from the community breadwinners, caregivers, parents, siblings and employees," which in turn impose severe financial costs on states and municipalities. *Id.* (citations omitted). These costs are not theoretical: Magalita is the sole caregiver for her 12-year-old daughter and her family, her employer and the residents of the group home where she works as a counselor all depend on her. Thus, the government's interest in part weighs *against* detention here. As a whole, the government's interest in detaining individuals without considering whether release conditions could mitigate danger to the community or flight is "uncertain at best, and may well be negative." *Id.*

Taken together, the *Mathews* factors weigh heavily in favor of requiring DHS to prove that a noncitizen's release would cause danger to the community or flight risk *even considering* the mitigating effect of release conditions.

C. Considering the mitigating effect of release conditions, the custody redetermination record was insufficient as a matter of law.

This Court asked what level of detail the IJ must provide to demonstrate that there was genuine consideration of conditions that are alternatives to detention. In responding, Petitioner submits that the first question a reviewing court must ask in habeas as to this issue is whether there was sufficient evidence in the record to support the IJ's conclusion. If the evidence in the record cannot support the conclusion by clear and convincing evidence that there are no sufficient alternatives to detention to mitigate the risk, then the evidence is insufficient as a matter of law to meet the constitutionally-required legal standard.

Next, the court in habeas jurisdiction must also assess even if the evidence in the record could potentially demonstrate that no conditions were sufficient, whether the IJ's decision demonstrates that the IJ properly applied that legal standard in addressing and rejecting such

alternatives. As discussed above, while there are no magic words to demonstrate this, the IJ's explanation of their decisions must be sufficient that the court in habeas can review the central aspects of the decision to insure that they complied with the law. See, e.g., *Tiu*, 2026 U.S. Dist LEXIS 236872, *7 (explaining that the IJ's reasoning must be "clear from and supported by the record."). Thus, to the extent that an IJ actually considers and rejects based upon substantial evidence a potential set of alternative conditions, there must both be a sufficient record for the Court to confirm that the correct standard was applied and supported by sufficient evidence, by an unbiased and neutral decisionmaker.

Moreover, in assessing the mitigating effects of release conditions, "the safety of the community can be reasonably assured without being absolutely guaranteed." *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990). If there is an "objectively reasonable assurance of community safety," then danger to the community by clear and convincing evidence is not established. *Id.* (internal quotation marks and citation omitted).

In this case, the IJ's decision cannot meet either part of this standard. There was no evidence in the record to address or demonstrate by clear and convincing evidence that Magalita would be a danger even with conditions of release such as a stay-away order. She was released by the arresting authorities. Such conditions, although obviously unnecessary here, certainly could have provided an "objectively reasonable assurance of community safety." *Tortora*, 922 F.2d at 884 (internal quotation marks and citation omitted). Under the correct legal standard, that alone would preclude the government from establishing to a reasonable certainty that her release would cause danger to the community.

Moreover, because the IJ included only a conclusory statement as to conditions of release and no analysis of why he rejected such conditions, the IJ's decision would also be insufficient

even if there were a sufficient record to support such a finding (and there is not). For this reason as well, the IJ's decision here failed to apply the correct standard of law and thus violated the Petitioner's due process right not be unnecessarily detained.

D. Petitioner does not need to establish prejudice, but she was prejudiced by the IJ's non-discretionary errors of law in her custody redetermination.

"Normally, when faced with a constitutional due process claim in the immigration context," this Court asks whether the error at issue "is likely to have affected the outcome of the proceedings." *Hernandez-Lara*, 10 F.4th at 41, 57 (internal citation and quotation marks omitted). That is, the Court analyzes whether there is "a likelihood that the IJ could have reached a different conclusion" but for the denial of due process. *Hernandez Lara v. Barr*, 962 F.3d 45, 58 (1st Cir. 2020). Because applying the wrong burden of proof at bond hearing is a structural error, it constitutes *per se* prejudice. *See Wilder v. United States*, 806 F.3d 653, 658 (1st Cir. 2015) (citation omitted); *Sullivan v. Louisiana*, 508 U.S. 275, 280, 282 (1993) (holding that erroneous instruction on the "reasonable doubt" standard of proof was a structural error). Applying the wrong legal standard is an error that "infect[s] the entire [hearing] process" and "necessarily render[s]" it "fundamentally unfair." *Wilder*, 806 F.3d at 658 (citations omitted); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954) (reversing agency action where BIA did not follow its own regulation requiring it to exercise its discretion independently without requiring a showing of prejudice); *Navia-Duran v. INS*, 568 F.2d 803, 808, 811 (1st Cir. 1977) (same, where agency violated its own regulation by failing to provide an arrestee with warnings about the use of statements in deportation proceedings and the right to counsel). *See generally Abedi v. Carter*, 2026 U.S. App. LEXIS 31989 (10th Cir. Oct. 21, 2026) (holding that violation of regulations that establish due process safeguards for detention of the petitioner was "per se prejudice" as well as inflicting prejudice in fact).

But here, this is not simply a collateral error of law by the IJ, the errors at issue here are "likely to have affected the outcome" at issue. *Hernandez-Lara*, 10 F.4th at 41.

*First*, basing a bond denial on dangerousness when the evidence was insufficient as matter of law is necessarily prejudicial. The insufficiency of the evidence means that dangerousness *was* not established and the IJ was required to reach the opposite outcome on the ultimate issue. This error is not just "likely to have affected the outcome of the proceedings," *id.*, it is certain to have done so.

*Second*, as to the IJ's failure to consider release conditions or require DHS to prove by clear and convincing evidence that no combination of bond and release conditions could reasonably assure community, and where such conditions clearly exist and are routinely used in far more serious domestic altercation situations, Petitioner can also show prejudice. There *are* available conditions of release that would mitigate any purported danger to the community. Accordingly, the outcome in Petitioner's custody redetermination hearing likely would have been different had the IJ applied the correct bond standard and held DHS to its full burden of proof.

## CONCLUSION

Wherefore, Petitioner asks that this Court enforce its September 11, 2026 Order, find that Respondents have failed to provide a bond hearing in compliance with the requirements of the law and this Court's order, and therefore that she should continue to be released.[8]

---

[8] Petitioner did not object to electronic monitoring as a condition of release on bail while this matter is briefed for this Court. She is extremely grateful to the Court for ordering her release while this briefing is ongoing, which enabled her to return to her work and her 12-year-old daughter, who was staying with a friend while Petitioner was detained. If the Court agrees that the bond hearing was constitutionally inadequate and her detention unsupported, the Petitioner also suggests that it would be appropriate going forward, based upon such a ruling, to relieve her of the need to wear an ankle monitor. The DHS did not argue and the IJ did not find that she is a risk of flight. Moreover, given the utter lack of evidence of actual dangerousness, the Petitioner submits that no such further monitoring is required.

Magalita has a 12-year-old daughter who lives with her and needs her. There is no benefit to the community to depriving this daughter of her mother. In truth, it is a great irony that this kind woman who was trying to do the right thing and raise her son to be responsible and do the dishes, should not only be charged with a crime because of the dispute, but detained and put on a fast-track to deportation, despite her pending asylum claim based upon her fear of return to Haiti. These factors both weigh strongly in favor of release for the good of the community and the family. Holding this kind mother in custody while she pursues a fruitless appeal is not justice and not consistent with the requirements for a bond hearing under the United States Constitution.

Respectfully submitted,

Dated: November 2, 2026

*/s/ Sara Miron Bloom*
Sara Miron Bloom, Esq. (#552351)
Rubin Pomerleau
Two Center Plaza, Suite 520
Boston, MA 02108
Tel: 617.367.0077 x 206
Email: sbloom@rubinpom.com

*Counsel for Petitioner*

**CERTIFICATE OF SERVICE AND PURSUANT TO LOCAL RULE 7.1**

I hereby certify that on November 2, 2026, I electronically filed the within document and it is available for viewing and downloading from the Court's CM/ECF System, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Sara Miron Bloom*